Francisco Jose RIVERO;  Pacific Internment Services, a California corporation, Plaintiffs–Appellees,

v.

CITY AND COUNTY OF SAN FRANCISCO, Defendant,

and

Joseph Surdyka;  Boyd Stephens, Defendants–Appellants.

No. 00–17113.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 12, 2002.

Filed Dec. 20, 2002.

Owen P. Martikan, City Attorney's Office, San Francisco, CA, for the defendants-appellants.

Randall B. Aiman–Smith, McPhee & Aiman–Smith, Oakland, CA, for the plaintiffs-appellees.

Before BEEZER, THOMAS and W. FLETCHER, Circuit Judges.

## OPINION

WILLIAM A. FLETCHER, Circuit Judge.

In this suit under 42 U.S.C. § 1983, a magistrate judge denied defendants Joseph Surdyka and Boyd Stephens's pretrial motion for summary judgment based on qualified immunity. After trial, the jury returned a damage verdict against Surdyka and Stephens. The magistrate judge denied Surdyka and Stephens's post-trial motion for judgment as a matter of law based on qualified immunity, but ordered a new trial based on inconsistency in the verdict. Before the second trial could take place, a district judge granted summary judgment to Surdyka and Stephens on the ground that they had not caused the injury to plaintiffs. The district judge specifically noted that he did not reach the question of qualified immunity.

In a prior appeal, plaintiffs appealed the grant of summary judgment by the district judge. Then-defendants-appellees Surdyka and Stephens did not cross-appeal, but argued as an alternative ground for affirming that they were entitled to qualified immunity. We reversed and remanded without reaching the qualified immunity question.

On remand, Surdyka and Stephens moved for judgment as a matter of law based on qualified immunity. The district court denied that motion, and they now seek to appeal that denial. Plaintiffs-appellees in this appeal contend that Surdyka and Stephens cannot appeal the denial be-

cause they failed to cross-appeal in the prior appeal. We disagree with that contention, but we affirm the district court on the merits.

## I. Background

On July 29, 1992, Francisco Jose Rivero, president of Pacific Internment Services, Inc. ("Pacific"), signed a contract with the City and County of San Francisco ("the City") to provide funeral and mortuary services for the City's indigent dead. Pacific had publicly bid and won its first indigent dead contract in 1989. Prior to 1989, the contract had been performed by the San Francisco College of Mortuary Science for almost 40 years. Pacific's 1989 contract had been administered by the San Francisco Department of Public Health, but the 1992 contract was administered by the San Francisco Medical Examiner's Office ("the MEO"). Pacific's 1992 contract ran from August 1, 1992, through July 31, 1994, with an optional term of extension. The contract contained a provision allowing the City to terminate the contract, without cause and for its convenience, on thirty days' written notice.

In May 1993, the San Francisco Mayor's office instructed its department heads to investigate ways to reduce expenditures. San Francisco Administrative Coroner Joseph Surdyka suggested that savings could be realized if the MEO began performing "in-house" the services Pacific was performing under its 1992 contract. Dr. Boyd Stephens, Chief Medical Examiner, then proposed to Chief Administrative Officer Rudolf Nothenberg various ways to reduce the MEO's budget, including performing in-house the indigent dead contract. After reviewing Stephens's proposal, Nothenberg recommended to the Mayor and the Board of Supervisors that they terminate Pacific's 1992 contract. The Mayor and the Board of Supervisors approved Nothenberg's recommendation, and on May 21, 1993, the City gave Pacific written notice of its intent to terminate the contract on June 30, 1993, just over a year before it was due to expire.

Rivero and Pacific responded by suing the City, Surdyka, Stephens, and Deputy Coroner Herbert Hawley to recover damages for breach of contract by the City; for inducing breach of contract by the individual defendants; for interference with the contract based on Rivero's race in violation of 42 U.S.C. § 1981 by the individual defendants; and for retaliation and interference with Rivero's First Amendment rights in violation of 42 U.S.C. § 1983 by the individual defendants. Plaintiffs alleged that in the course of obtaining and performing the 1989 contract, Rivero became aware of illegal actions by the individual defendants—including false billings, false reporting of funeral cases, illegal embalming of bodies, and illegal bribes and kickbacks. Rivero reported these activities to the media and to the San Francisco District Attorney's criminal investigations unit. Rivero also testified before a criminal grand jury, which issued a report highly critical of the defendants. According to plaintiffs, the MEO thereafter gained control over the administration of the indigent dead contract from the Department of Public Health, and the individual defendants then procured the cancellation of Pacific's 1992 contract in retaliation for Rivero's whistleblowing.

The individual defendants moved before trial for summary judgment based on qualified immunity. The magistrate judge, to whom the parties agreed to have the case transferred for final disposition, denied the motion. The defendants did not take an interlocutory appeal, and the case went to trial. In 1995, a jury found there had been no breach of contract (and necessarily no inducement of breach of contract), and found no racial discrimination in violation of § 1981. It found, however, that Surdy-

ka and Stephens had retaliated against Rivero for exercising his First Amendment rights, in violation of § 1983, and awarded damages. Surdyka and Stephens then filed a motion for judgment as a matter of law based on qualified immunity or for a new trial based on inconsistency in the verdict. The magistrate judge held that Surdyka and Stephens were not entitled to judgment as a matter of law, but ordered a new trial. Surdyka and Stephens did not take an interlocutory appeal from the denial of their motion for judgment as a matter of law.

Before the new trial could take place, the defendants moved for summary judgment based on lack of causation and qualified immunity. The district judge, to whom the case reverted after recusal by the magistrate judge, granted summary judgment based on lack of causation. He specifically declined to reach the question of qualified immunity. The plaintiffs appealed. Then-defendants-appellees Surdyka and Stephens did not cross-appeal. In their brief to us, Surdyka and Stephens argued both that the magistrate judge had properly granted a new trial based on the inconsistency of the verdict, and that the district judge had later properly granted summary judgment. They argued in support of the summary judgment on alternative grounds—lack of causation (the ground relied upon by the district judge) and qualified immunity (the ground not reached by the district judge).

We reversed. In an unpublished memorandum disposition, we held that the magistrate judge had erred in granting a new trial because the verdict was not inconsistent in finding that the City had not breached the contract, but that Surdyka and Stephens had nonetheless violated § 1983. *See Rivero v. City & County of San Francisco,* 221 F.3d 1349 (9th Cir. 2000) (table) (*"Rivero I"*). The rationale for our holding was that the City may not

have been liable for breach of contract because it did not know of the improper motives of Surdyka and Stephens in recommending the termination to Nothenberg, but that Surdyka and Stephens could nonetheless be liable for violating § 1983 because their retaliatory actions caused the City to terminate the contract. Our rationale necessarily meant that we disagreed with the district judge's order granting summary judgment based on lack of causation. We noted the defendants' qualified immunity argument in a footnote, but did not reach it. We reversed and remanded.

Before the district court entered judgment on remand, Surdyka and Stephens filed a renewed motion for judgment as a matter of law based on qualified immunity. The district court denied the motion and entered judgment on the verdict. Surdyka and Stephens timely appeal.

## II. Discussion

### A. Appellate Jurisdiction

Relying on *El Paso Natural Gas Co. v. Neztsosie,* 526 U.S. 473, 119 S.Ct. 1430, 143 L.Ed.2d 635 (1999), plaintiffs-appellees contend that Surdyka and Stephens were required to raise the issue of qualified immunity by a cross-appeal in the prior appeal, and that their failure to cross-appeal prevents them from raising the issue in the present appeal. Plaintiffs-appellees contend that if we consider Surdyka and Stephens's qualified immunity argument in this appeal we will sanction an "end-run" around *El Paso.* We disagree.

In *El Paso,* we had reversed, on interlocutory appeal, preliminary injunctions that had not been appealed by either party. *See El Paso Natural Gas Co. v. Neztsosie,* 136 F.3d 610, 620 (9th Cir.1998). The Supreme Court vacated our decision, holding that we erred in reversing the prelimi-

nary injunctions against the appellees. *See El Paso*, 526 U.S. 473, 119 S.Ct. 1430, 143 L.Ed.2d 635. The Court stated:

> [a]bsent a cross-appeal, an appellee may "urge in support of a decree any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court," but may not "attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary."

*Id.* at 479, 119 S.Ct. 1430 (quoting *United States v. Am. Ry. Express Co.*, 265 U.S. 425, 435, 44 S.Ct. 560, 68 L.Ed. 1087 (1924)).

██ There is nothing in *El Paso* that limits the ability of an appellee to argue an alternative ground for affirming a district court judgment without taking a cross-appeal, when the only consequence of the court of appeals' agreement with the argument would be the affirmance of the judgment. "[P]revailing parties ... need not have filed cross-appeals in order to correct errors in the district court's reasoning nor to preserve alternative grounds for affirming the judgment." *Valdez v. Rosenbaum*, 302 F.3d 1039, 1044 (9th Cir.2002). So long as the appellee does not seek to "enlarge" the rights it obtained under the district court judgment, or to "lessen" the rights the appellant obtained under that judgment, appellee need not cross-appeal in order to present arguments supporting the judgment. *Lee v. Burlington N. Santa Fe Ry. Co.*, 245 F.3d 1102, 1107 (9th Cir.2001) ("A prevailing party need not cross-petition to defend a judgment on any ground properly raised below, so long as that party seeks to preserve, and not to change, the judgment.") (quoting *Northwest Airlines, Inc. v. County of Kent*, 510 U.S. 355, 364, 114 S.Ct. 855, 127 L.Ed.2d 183 (1994)).

██ Thus, if the district court enters a judgment that denies all relief to a plaintiff, and the plaintiff appeals from that judgment, a defendant-appellee seeking to uphold the judgment need not cross-appeal and may urge affirmance on any ground appearing in the record. *See Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1062 (9th Cir.2001) (appellate court may affirm on any ground supported by the record, even if not relied upon by the district court). If the court of appeals agrees with the plaintiff-appellant and alters the judgment in some way, it provides relief that was not provided by the district court, and thereby "enlarges" the rights of the plaintiff-appellant and "lessens" the rights of the defendant-appellee. But if the court of appeals agrees with the defendant-appellee and sustains the judgment, it only affirms what the district court did. Even if it affirms on the alternative ground, its decision leaves the parties where the district court left them. In that event, the court of appeals does not "enlarge" the rights of the defendant-appellee or "lessen" the rights of the plaintiff-appellant.

██ The case before us is precisely such a case. In the prior appeal, Rivero and Pacific were the plaintiffs-appellants. The district judge had entered summary judgment against them, thereby denying all relief. Surdyka and Stephens were the defendants-appellees seeking to uphold that judgment. If Surdyka and Stephens had succeeded on appeal, the district court judgment would have been affirmed, and the parties would have been left in the same position they had been left by the judgment of the district court. Therefore, Surdyka and Stephens did not need to take a cross appeal in the prior appeal in order to argue, as an alternative ground for affirming the judgment, that they had qualified immunity.

██ Plaintiffs also contend that because Surdyka and Stephens could have taken interlocutory appeals on the ground of

qualified immunity prior to the 1998 appeal, they should have done so. It is true that Surdyka and Stephens could have taken an interlocutory appeal from the magistrate judge's pre-trial denial of their motion for summary judgment, or from her post-trial denial of their motion for judgment as a matter of law. *See Mitchell v. Forsyth*, 472 U.S. 511, 526–27, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). But "could have" is not "should have." We have previously made clear that the rule permitting a defendant to take an interlocutory appeal after a denial of a motion based on qualified immunity is not a rule requiring the defendant to take that appeal. *See DeNieva v. Reyes*, 966 F.2d 480, 484 (9th Cir. 1992) ("We reject this argument because it would transform the permissive rule of *Mitchell*—that a defendant *may* appeal a denial of qualified immunity—into a requirement of immediate appeal that *Mitchell* does not announce (or even intimate) and that would ignore principles of judicial economy by creating delays that waste the time and resources of the courts and the litigants.").

■■■ We therefore proceed to the merits of Surdyka and Stephens's appeal. We review *de novo* the district court's denial of a motion for judgment as a matter of law. *See Johnson v. Paradise Valley Unified Sch. Dist.*, 251 F.3d 1222, 1226 (9th Cir.2001). Judgment as a matter of law is proper if the evidence, construed in the light most favorable to the nonmoving party, permits only a conclusion contrary to the jury's verdict. *See McLean v. Runyon*, 222 F.3d 1150, 1153 (9th Cir.2000).

### B. Merits

#### 1. Valuable Governmental Benefit

■■■ Government officials are entitled to qualified immunity only "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Surdyka and Stephens's retaliatory acts took place in 1993. In *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), decided twenty-five years earlier, the Supreme Court established that a public employee has a First Amendment right to speak publicly on matters of public concern. In *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), decided twenty-one years earlier, the Supreme Court established that a government entity may not deny a person a "valuable governmental benefit" in retaliation for that person's exercise of First Amendment rights. Such a benefit, according to the Court in *Perry*, included "public employment," "tax exemptions," "unemployment benefits," and "welfare payments." *Id.* (collecting cases). By the time Surdyka and Stephens acted, this circuit had construed *Pickering* and *Perry* in such a manner that a reasonable person would have known that deliberate retaliation by state employees against an individual for speaking out on matters of public concern, with the intent of depriving the speaker of a valuable government contract, violated the First and Fourteenth Amendments.

In *Hyland v. Wonder*, 972 F.2d 1129 (9th Cir.1992) ("*Hyland I*"), the San Francisco Juvenile Probation Department dismissed Hyland, a volunteer, after he delivered to judges supervising the San Francisco Juvenile Hall a memorandum detailing problems involving the Hall and its director. We held that although Hyland was unpaid and could have been terminated at will, his volunteer position nonetheless constituted a government benefit or privilege that the government " 'may not deny . . . to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech.' " *Hyland I*, 972 F.2d at

1136 (quoting *Perry,* 408 U.S. at 597, 92 S.Ct. 2694). We stated:

> In sum, whether Hyland is labelled a public employee or a volunteer is not determinative of whether Hyland stated a claim of First Amendment infringement. Nor is the at—will nature of his position dispositive. The critical question is simply whether Hyland has alleged *the loss of a valuable governmental benefit or privilege* in retaliation for his speech.

*Id.* (emphasis added).

After we reversed the district court's dismissal of Hyland's First Amendment claim and remanded the case for further proceedings, the district court granted summary judgment in favor of the defendants based on qualified immunity. On appeal, the appellee-defendants insisted that because there had been no Ninth Circuit case prior to *Hyland I* involving a volunteer, no reasonable official would have known that the action of firing Hyland violated the First Amendment. *Hyland v. Wonder,* 117 F.3d 405, 411 (9th Cir.1997) (*"Hyland II"*). We disagreed, holding that our case law does not require that degree of specificity as long as " 'in the light of pre-existing law the unlawfulness [is] apparent.'" *Hyland II,* 117 F.3d at 411–12 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). We emphasized that "[i]t was clearly established in 1988 that the government could not take action against an individual who, while not a salaried employee, received a valuable benefit analogous to employment, because that individual exercised his First Amendment right to speak out on a matter of public concern." *Id.* at 412.

We now hold that it was clearly established in 1993 that state employees could not cause the termination of a two-year for-profit government contract in retaliation for the contracting party's exercise of his First Amendment rights to speak out on a matter of public concern. Although we had not specifically held prior to 1993 that such a contract was a "valuable governmental benefit" for purposes of First Amendment retaliation law, a reasonable person would have known from *Pickering, Perry* and *Hyland I* that this was the law in this circuit.

Surdyka and Stephens contend that we expressly excluded independent government contractors from the constitutional protection provided by *Perry,* and therefore from the protection provided by *Hyland I,* when we decided *San Bernardino Physicians' Services Med. Group, Inc. v. County of San Bernardino,* 825 F.2d 1404 (9th Cir.1987). We disagree. In *San Bernardino,* San Bernardino Physicians' Services Medical Group ("Physicians' Group") contracted with the Board of Supervisors for San Bernardino County to provide professional emergency room and burn care treatment services to the county-operated medical center. The county prematurely terminated the contracts, allegedly without cause and without a pre-deprivation hearing. Physicians' Group sued under §§ 1983 and 1985, claiming that the county's actions deprived them of property without due process of law. We held that the contract of the Physicians' Group was not property entitled to due process procedural protections: The "Physicians' Group['s] supply contracts are fundamentally different from tenured employment contracts, which are protected by a due process requirement of predeprivation hearing." *San Bernardino,* 825 F.2d at 1410 n. 7.

*San Bernardino* is inapposite because the Physicians' Group did not claim a violation of its First Amendment rights. Rather, it claimed a violation of its property rights under the due process clause. Plaintiffs in this case do not claim that

Pacific's 1992 contract was a property right within the meaning of the procedural protections of the due process clause (although, in fact, it may have been). Rather, they claim that Surdyka and Stephens unconstitutionally retaliated against Rivero for his exercise of his First Amendment rights.

Surdyka and Stephens also contend that it was not established law that a government contract was a valuable governmental benefit until the Supreme Court's 1996 decision in *Board of County Commissioners v. Umbehr*, 518 U.S. 668, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996), three years after the acts at issue in this case. It is true that the Court resolved a circuit split in *Umbehr*, holding that a government contract is a valuable governmental benefit within the meaning of First Amendment retaliation law. But the fact that there was a circuit split does not mean that the law was not clear in this circuit prior to the Court's decision in *Umbehr*. It was clear, and the Supreme Court's decision in *Umbehr* merely confirmed what was already the law in this circuit. The issue is not what the law was or might have been in other circuits in 1993. It is, rather, what the "controlling authority in [the defendants'] jurisdiction[was] at the time of the incident." *Wilson v. Layne*, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999).

### 2. *Pickering* Balancing Test

■ In order to overcome Surdyka and Stephens's defense of qualified immunity, it is not enough for plaintiffs merely to show that their 1992 contract was a valuable government benefit. They must also show:

> that two things were clearly established at the time of [Surdyka and Stephens's actions that caused the contract] termination: (1) that [Rivero's] speech involved a matter of public concern and (2) that the interests served by allowing

[him] to express[himself] outweighed the state's interest in promoting workplace efficiency and avoiding workplace disruption.

*Hufford v. McEnaney*, 249 F.3d 1142, 1148 (9th Cir.2001) (internal quotation marks omitted; first and second bracketed material added). The second element of the test is often referred to as the *Pickering* balancing test.

■ Surdyka and Stephens do not argue that the first element of the test has not been satisfied. The record clearly shows that Rivero spoke out on a matter of public concern. He testified at trial that he went to the San Francisco District Attorney's office and reported to Investigator Duane Hadley that "the medical examiner's office by way of its deputies and the Administrative Coroner [Surdyka] and the Chief Medical Examiner, Dr. Stephens, w[as] accepting bribes and kickbacks, illegal, what they call gratuities from funeral directors and from the College of Mortuary Science." Hadley's investigation resulted in the convening of the grand jury before which Rivero testified. Rivero also went to the press and was interviewed at least two or three times on television regarding the allegations that he had made against the defendants.

Surdyka and Stephens do argue, however, that plaintiffs-appellees have failed to satisfy the second element of the test. That is, they argue that it was not "clearly established" that the outcome of the *Pickering* balancing test favored Rivero. This is preliminarily an ordinary question of fact: What did defendants do, and why did they do it? That question is to be determined by the jury under the ordinary standard of proof for factual questions in a civil case. But once the factual question is determined, the question then becomes whether it is "clearly established" that the

outcome of the balancing test favors Rivero.

The factual question is whether Surdyka and Stephens retaliated against Rivero for his whistleblowing activity. Surdyka and Stephens contended at trial that "they could reasonably have terminated Rivero's contract" for other speech on matters of purely private concern, rather than for his speech on matters of public concern. Rivero contended at trial, however, that Surdyka retaliated against him not merely for speech on matters of public concern, but for a special subcategory of such speech—whistleblowing.

There is ample evidence from which the jury reasonably could have concluded that Surdyka and Stephens caused the termination of Pacific's 1992 contract in retaliation for Rivero's whistleblowing. There was evidence from which the jury reasonably could have concluded that Surdyka and Stephens sought to harm Rivero and his company. This evidence is not limited to the acts of Surdyka and Stephens that brought about the termination of the contract. For example, other evidence included Rivero's testimony that he once picked up 70 to 80 crates of autopsy viscera from Surdyka for cremation. The viscera exploded, ruining two cremation machines. Rivero testified that he believed that pacemakers had been in the viscera and had exploded, even though it is standard practice in the industry to take great care to ensure that pacemakers not be cremated. Surdyka denied everything,[1] but the jury could reasonably have disbelieved his denial.

There was also evidence from which the jury could have concluded that Surdyka and Stephens's actions stemmed from Rivero's whistleblowing. It is undisputed

that Rivero's whistleblowing brought very public, widespread negative attention to Surdyka and Stephens, and there is evidence from which the jury could have concluded that Surdyka and Stephens were unhappy with Rivero because of his whistleblowing. For example, Investigator Hadley testified that when he interviewed the defendants, Surdyka was "upset" and Stephens "upset" and "angry" about the publicity Rivero had caused.

■ [6] Once the factual question is determined, the question becomes whether the outcome of the balancing test is "clearly established" based on those facts. The answer to that question can hardly be in doubt. Whistleblowing is a particular kind of speech on matters of public concern. It was already the law of this circuit in 1993 that the state's legitimate interest in "workplace efficiency and avoiding workplace disruption" does not weigh as heavily against whistleblowing speech as against other speech on matters of public concern. As we wrote in 1988, in *Roth v. Veteran's Administration*, 856 F.2d 1401, 1407–08 (9th Cir.1988) (quoting *Czurlanis v. Albanese*, 721 F.2d 98, 107 (3d Cir.1983)):

> An employee who accurately exposes rampant corruption in her office no doubt may disrupt and demoralize much of the office. But it would be absurd to hold that the First Amendment generally authorizes corrupt officials to punish subordinates who blow the whistle simply because the speech somewhat disrupted the office.

*See also Hufford*, 249 F.3d at 1149 ("Employers cannot be said to have a legitimate interest in silencing reports of corruption or potential illegality."). If anything, the government interest is weaker in this case

---

1.  Q [to Surdyka]: Did you put pacemakers in the specimens that you left for Mr. Rivero to pick up?
    A: Never.

Q: Do you know who did?
A: No one put pacemakers in the viscera or viscera boxes or specimen boxes.

than in *Roth* and *Hufford* (and, indeed, in *Pickering*), for those cases involved employees and the efficiency of their workplace rather than independent contractors and the efficient performance of their contracts. An employee's workplace often involves much more intimate working relationships than the place of performance of a government contract, and the potential for inefficiency and disruption as a result of whistleblowing are, if anything, greater in the case of an employee.

We conclude that defendant-appellees Surdyka and Stephens may assert their defense of qualified immunity in this appeal. On the merits, however, we conclude that a reasonable person in 1993 would have known that Surdyka and Stephens's actions violated clearly established law, and that Surdyka and Stephens are therefore not entitled to qualified immunity.

AFFIRMED.